IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | * | |
| Plaintiff, | * | |
| v. | * | CIVIL NO.: WDQ-03-1877 |
| NATHAN A. CHAPMAN, JR., *et al.* | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

The Securities and Exchange Commission ("SEC") sued Nathan Chapman, Chapman Capital Management ("CCM"),[1] and others for securities fraud and related claims. For the following reasons, the SEC's motion for partial summary judgment against Chapman will be granted. Its motion for partial summary judgment against CCM will be denied, but default judgment will be entered on all claims asserted against it.

---

[1] Chapman represents himself. On August 5, 2005, the Court granted counsel for CCM's motion to withdraw. ECF No. 127. Counsel sent CCM notice that it had to obtain new counsel within 30 days or it would be subject to default judgment. ECF No. 118 at 3.

The Court will not order summary judgment against CCM as CCM was not represented when the motion was briefed. However, CCM has not obtained new counsel since August, 2005. Accordingly, pursuant to Local Rule 101(2)(b), default judgment will be entered against CCM on all claims.

I.   Background[2]

Before 1999, Chapman founded and was the chairman of the board, chief executive officer ("CEO"), and majority shareholder of several financial services companies, including The Chapman Company ("TCC"), a securities broker-dealer, and CCM, an investment advising and management firm.   ECF No. 66 ¶19.

CCM was the investment manager for the DEM-MET Trust, a pooled trust designed for diversified investments using minority-owned sub-advisers.   *Id*. ¶16.   From January 1997 to August 2001, Alan Bond was a sub-adviser to the DEM-MET Trust through his investment company, Albriond Capital Management. *Id*. ¶17.[3]   The trust had three clients in 2000: the Maryland State Retirement and Pension System, Bankers Trust Company Pension Plan, and Alliant Energy Corporation.   *Id*. ¶ 16.

---

[2] For the SEC's motion for summary judgment, Chapman's evidence "is to be believed, and all justifiable inferences are to be drawn in [his] favor."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

[3] The DEM-MET trust agreement required that CCM provide written disclosure to the trust clients if TCC acted as a principal in a transaction, and CCM had an investment advisory agreement with the sub-advisers that prohibited sub-advisers from purchasing shares of a company in which an insider owned more than 50 percent, for the trust.   ECF No. 149 Attach. 18 at 6; *id*. Attach. 20 Annex I at 4-5 [hereinafter "Trust Agreement"].   CCM "acted through" Chapman, who "dealt directly with the Trust's investors."   ECF No. 66 ¶¶18, 42. CCM agreed to identify an "authorized representative" of CCM to act on CCM's behalf. Trust Agreement Annex I at 34.   Chapman appears to have signed the agreement as CCM's president.   *Id*. Annex I at 36 (signature block).

In 1998, Chapman took two companies public: Chapman Holdings, Inc. ("CHI"), TCC's parent company, and Chapman Capital Management Holdings, Inc. ("CCMH"), CCM's parent company. *Id.* ¶21.  The Initial Public Offerings ("IPO") were successful, netting over $12 million, and by November 1999, Chapman owned about 73 percent of CHI's and CCMH's outstanding shares. *Id.*

In November 1999, Chapman introduced eChapman, a new public company he planned to form by merging CHI and CCMH.  TCC would be the lead, and largest, underwriter for eChapman's IPO. *Id.* ¶¶24-25, 27.  At that time, eChapman filed an initial registration statement with the SEC for an IPO of 3,333,333 shares of its common stock, costing $14 to $16 per share. *Id.* ¶25.  CHI and CCMH's shares would be converted into eChapman shares during the merger, and Chapman would own about 63 per-cent of the new company. *Id.* ¶26.  Chapman solicited Bond to buy 200,000 of the IPO shares using DEM-MET funds at the $13 per share price, and other DEM-MET sub-advisers to buy 20,000 of the shares during the IPO.  ECF No. 1 ¶47; ECF No. 66 ¶¶44, 47.

In early 2000, stock values of internet companies dropped sharply and interest in eChapman fell.  By June 2000, the underwriters had commitments for slightly more than one-third of the shares to be offered in the IPO, and eChapman reduced the

number and asking price of shares it would offer, and pushed back its offering date.  ECF Nos. 1 ¶¶33-34; 66 ¶35.

On June 15, 2000, eChapman's IPO opened and the underwriters offered 1,260,000 shares at $13 per share.  The IPO purchases were recorded with trade and process dates of June 15, 2000, and a settlement date of June 20--the first day of public trading.  *Id.* ¶38. On June 20, 2011, eChapman, available for public trading, opened at $8 per share, hovered between $7 and $8 per share for two days, then slid until it fell below $1 per share, where it remained.  ECF No. 66 ¶39.

Chapman told the sub-advisers' representatives that there would be no conflict of interest when they purchased the shares, but CCM, as the trust's investment adviser, was an "insider," Chapman, who controlled CCM, was a majority owner of eChapman, and TCC, which Chapman also controlled, would broker the deal. ECF No. 1 ¶49.

On June 26, 2000, Chapman convinced Bond to purchase more eChapman stock at $13 per share because an underwriter had dropped out of the IPO.  Bond bought 175,000 more shares for $13 per share when the market price was $7 per share.  The sale was backdated to June 20, 2000, as if it had been part of the IPO. *Id.* ¶50; *United States v. Chapman*, 209 F. App'x 253, 260 (4th Cir. 2006).

4

On June 26, 2003, the SEC sued Chapman, CCM, TCC, eChapman, and several of Chapman's employees for violating § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) ("Securities Act"), §10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), SEC Rule 10b-5, § 206 of the Investment Advisers Act, 15 U.S.C. § 80b-6, and § 13(a) of the Exchange Act and SEC rules associated with that section. ECF No. 1 ¶¶95-108. In February 2009, the Court dismissed TCC and eChapman on the SEC's motion, and the SEC settled with two of the three employees.[4] ECF Nos. 138, 142, 144.

In 2004, a jury convicted Chapman on 23 counts of Mail and Wire Fraud, in violation of 18 U.S.C. §§ 1341 and 1343, Investment Adviser Fraud, in violation of 15 U.S.C. § 80b-6, and other crimes, based on the eChapman IPO, including the backdated share sales.[5] *Chapman*, 209 F. App'x at 260-61. The jury found

---

[4]   On April 27, 2010, the SEC stated that it was engaging in settlement discussions with the other remaining defendant, Earl Bravo. ECF No. 148. The Court will order the SEC to provide a status report on the remaining issues, including the claim against Bravo.

[5]   Chapman's second superseding indictment contained 35 counts. The jury convicted on counts 1, 2, 4, 6-15, 18-25, 29, and 30. Count 1 charged that on June 15, 2000, Chapman, through TCC, committed wire fraud in a wire transmission from Maryland to New Jersey about Bond's purchase of the 200,000 IPO shares for the DEM-MET trust. ECF No. 149 Attach. 5 at 26. Counts 2, 4, and 6 charged that on June 26, 2000, Chapman committed wire fraud in wire transmissions between New Jersey and Maryland about Bond's purchase of the 175,000 shares that were bought at IPO prices and backdated to June 20, 2000. *Id.* at 26-27.

beyond a reasonable doubt that Chapman's criminal conduct cost

the DEM-MET clients $5,000,856.  *United States v. Chapman*, No.

03-0301, ECF No. 100 at 27 (Aug. 13, 2004) [hereinafter "Jury

Verdict"].  On February 20, 2007, the Court sentenced Chapman to

63 months imprisonment and ordered that he make restitution of

the full $5,000,856 of loss.[6]  ECF No. 149 Attach. 6 at 2, 4.

---

Counts 7 through 13 related to communications about Bond's
purchase of eChapman shares in May, 2001.  Counts 14 through 17
charged Chapman with mail fraud based on the June, 2000
transactions.  *Id*. at 29.

Counts 19-21 charged Chapman with violating his fiduciary
duty, as an investment adviser, to: (1) act in good faith and in
the best interests of his clients, (2) make full and fair
disclosure of all material facts bearing on the investment
advisory relationship between CCM and its clients, (3) use
reasonable care to avoid misleading his clients, and (4) refrain
from self-dealing; by knowingly and willfully, directly and
indirectly, (a) employing devices, schemes, and artifices to
defraud three of his DEM-MET investment advisory clients, (b)
engaging in transactions, practices, and courses of business
which operated as a fraud and deceit upon the clients, *and* (c)
caused CCM to act as a principal for its own account and
knowingly purchasing and selling securities for a client without
disclosing to the client and obtaining consent, in writing,
before completing the transaction, the capacity in which he was
acting, all in violation of 15 U.S.C. § 80b-6.  *Id*. at 31-32.
*But see United States v. Chapman*, no. 03-0301, ECF No. 100 at
16-19 (Aug. 13, 2004) (finding Chapman guilty under the SEC's
(b) and (c) theories above, but finding that Chapman caused TCC,
not CCM, to act as a principal for its own account) [hereinafter
"Jury Verdict"].

[6] Chapman appealed his conviction and sentence, then moved to
vacate the conviction under 28 U.S.C. § 2255.  On direct appeal,
the Fourth Circuit affirmed Chapman's convictions and the
restitution but remanded for resentencing under *United States v.
Booker*, 543 U.S. 220 (2005).  *Chapman*, 209 F. App'x at 257,
*cert. denied*, 550 U.S. 949 (2007).  The Court denied his motion
to vacate, *Chapman v. United States*, No. 03-0301, 2008 WL

On June 3, 2010, the SEC moved for partial summary judgment in the civil case.  ECF No. 149.  On July 9, 2010, Chapman opposed the motion.  ECF No. 159.  On January 24, 2011, he filed a memorandum in support of his opposition.[7]  ECF No. 162.

II.  Analysis

A.   Standard of Review

Under Rule 56(a), summary judgment "shall [be] grant[ed] . . . if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In considering the motion, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable

---

3896116 (D. Md. Aug. 19, 2008), the Fourth Circuit affirmed, *United States v. Chapman*, 593 F.3d 365, 366 (4th Cir. 2010), and the Supreme Court denied Chapman's petition for *certiorari*, 131 S. Ct. 900 (2011).

[7] On January 3, 2011, the Court granted Chapman an additional 21 days to respond to the motion for summary judgment.  ECF No. 161.  On February 4, 2011, Chapman filed a sur-reply without leave of the Court.  ECF No. 164.  As the sur-reply did not affect the outcome of the motion, the Court considered it.

inferences in h[is] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but it also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted).

B.   Collateral Estoppel as to Chapman

The SEC contends that it is entitled to summary judgment on the first and third claims of the complaint because Chapman's convictions, combined with party admissions and principals of agency law, establish all elements of securities and investment adviser fraud.  ECF No. 149 Attach. 1 at 1.  Thus, according to the SEC, Chapman is collaterally estopped from disputing the elements established in his criminal trial.

Collateral estoppel bars relitigation of an issue determined in an earlier proceeding when:

> (1) the issue sought to be precluded is identical to one previously litigated; (2) the issue . . . ha[s] been actually determined in the prior proceeding; (3) determination of the issue [was] a critical and necessary part of the decision in the prior proceeding; (4) the prior judgment [is] final and valid; and (5) the party against whom estoppel is asserted . . . had a full and fair opportunity to litigate the issue in the previous forum.

*Sedlack v. Braswell Svc's Group, Inc.*, 134 F.3d 219, 224 (4th Cir. 1993).

### 1.  Count One: Securities Fraud

Chapman argues that his conviction does not bar litigation of the allegations in count one because his conviction does not establish that he used the mails in furtherance of a scheme to defraud.  ECF No. 164 at 2.

### i.  Identity of Issues

Count One alleges that Chapman violated §17(a) of the Securities Act,[8] § 10(b) of the Exchange Act,[9] and Rule 10b-5

---

[8] That section states:

> It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly
> (1) to employ any device, scheme, or artifice to defraud; or
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Securities Act of 1933 § 17(a), 15 U.S.C. § 77q(a).

[9] That section states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . ., any manipulative or deceptive device or contrivance in contravention of such rules and reg-

under the Exchange Act.[10]  Compl. ¶97.  The SEC can prove the
allegations by establishing that Chapman, directly or
indirectly, (1) used the mails or interstate commerce to employ,
(2) knowingly or intentionally, a scheme to defraud in which
Chapman made a materially false statement or omission, (3) in
the offer or sale of securities.  *See* 15 U.S.C. §§ 77q(a),
78j(b); 17 C.F.R. § 240.10b-5; *Aaron v. SEC*, 446 U.S. 680, 691
(1980).[11]

---

ulations as the Commission may prescribe as necessary
or appropriate in the public interest or for the
protection of investors.

Securities Exchange Act of 1934 §10(b), 15 U.S.C. § 78j(b).

[10] That section states:

It shall be unlawful for any person, directly or
indirectly, by the use of any means or instrumentality
of interstate commerce, or of the mails or of any
facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to
defraud,
(b) To make any untrue statement of a material fact or
to omit to state a material fact necessary in order to
make the statements made, in the light of the circum-
stances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of busi-
ness which operates or would operate as a fraud or de-
ceit upon any person, in connection with the purchase
or sale of any security.

Rule 10b-5, 17 C.F.R. § 240.10b-5.

[11] The elements are the same for §§ 17(a) and 10(b).  *United
States v. Naftalin*, 441 U.S. 768, 778 (1979).

Chapman was convicted of Mail and Wire Fraud, in violation of 18 U.S.C. §§ 1341 and 1343. To find a violation of either type of fraud, a jury must find beyond a reasonable doubt that the defendant: (1) used the mails or interstate wire communications in furtherance of (2) a scheme to defraud for which the defendant acted intentionally, and (3) the scheme "involved a material misrepresentation or concealment of fact." *United States v. Harvey*, 532 F.3d 326, 333 (4th Cir. 2008) (*citing Neder v. United States*, 527 U.S. 1, 25 (1999)); *United States v. Godwin*, 272 F.3d 659, 666-67 (4th Cir. 2001).

Although wire fraud is not identical to securities fraud[12] and thus the claims are not identical, the SEC seeks to use the elements underlying the convictions to establish elements of its claim. The first element of mail and wire fraud, use of the mails or interstate commerce, satisfies the first element of securities fraud.[13] The second and third elements satisfy the second and third elements of securities fraud: a scheme to defraud, a material misstatement of fact or omission, and intentional commission. Thus, the issues are identical with

---

[12] *See SEC v. Zandford*, 535 U.S. 813, 818 (2002) (defendant could be collaterally estopped from challenging the facts underlying his conviction for wire fraud in subsequent civil suit alleging Exchange Act securities fraud, but SEC had to prove connection with securities).

[13] *Compare* 18 U.S.C. §§ 1341 and 1343 *with* 15 U.S.C. §§ 77q(a), 78j(b); 17 C.F.R. § 240.10b-5.

respect to the first, second and third elements of the securities fraud claim.

### ii.   Actual & Necessary Determination of the Issues

"In the case of a criminal conviction based on a jury verdict of guilty, issues which were essential to the verdict must be regarded as having been determined by the judgment." *Emich Motors Corp. v. Gen. Motors Corp.*, 340 U.S. 558, 569 (1951).[14]

Here, the jury actually and necessarily determined that Chapman (1) used the mails and interstate wire communications in furtherance of (2) a scheme to defraud for which he had the specific intent to defraud, and (3) he made material misrepresentations or omissions.  *See Harvey*, 532 F.3d at 333.

### iii. Finality and Validity of Prior Judgment

A criminal conviction is a final judgment on the merits. *See Smith v. SEC*, 129 F.3d 356, 362 (6th Cir. 1997). Chapman's conviction is final.[15]   Chapman had the opportunity to challenge the sufficiency of the evidence in the criminal trial on direct

---

[14] *See also United States v. Beaty*, 245 F.3d 617, 624 (6th Cir. 2001); *United States v. Karron*, 750 F. Supp. 2d 480, 487 (S.D.N.Y. 2011).

[15] Chapman's § 2255 petition does not affect his conviction's finality.  Even if it did, that proceeding became final on January 10, 2011 when the Supreme Court denied *certiorari*, 131 S. Ct. 900 (2011).  *Smith*, 129 F.3d at 363 n.7; *Amcast Indus. Corp. v. Detrex Corp.*, 45 F.3d 155, 158 (7th Cir. 1995).

appeal, but did not challenge the sufficiency of the evidence,[16] and the Fourth Circuit affirmed his convictions. Accordingly, his conviction is final and valid.

iv.   Chapman's Opportunity to Litigate

A party has had a full and fair opportunity to litigate an issue only if he was a party to the prior suit, or is within certain limited circumstances. *See Taylor v. Sturgell*, 553 U.S. 880, 892-96 (2008).

Chapman had the opportunity and incentive to litigate in the initial, criminal proceeding because he was the defendant in that proceeding. Accordingly, Chapman is collaterally estopped from denying that he (1) used the mails and interstate wire communications in furtherance of (2) a scheme to defraud for which he had the specific intent to defraud, and (3) made material misrepresentations or omissions.

2.   Count Three: Investment Adviser Fraud

Chapman argues that his conviction under the Investment Adviser's Act was too vague to determine what issues were necessarily decided, and there is a continuing "dispute as to whether CCM and [Chapman] were acting as investment advisers or as investment adviser consultants" during the course of the

---

[16] *See, United States v. Chapman*, 209 F. App'x 253, 257, 265 n.3 (4th Cir. 2006) ("Chapman does not . . . contend that the absence of expert testimony renders the government's evidence insufficient to support his convictions.").

crime.  ECF No. 164 at 3.  Chapman also contends that the jury
did not necessarily find that he "acted as a principal for [his]
own account or acted as a broker as proscribed by" § 206(2) and
(3).  *Id.* (internal quotation marks omitted).

### i.   Identity of issues

The civil and criminal charges alleged violations of the
same section of the Investment Adviser's Act, and are thus
identical.  *Compare* ECF No. 1 ¶¶106-07 *with* ECF No. 149 Attach.
5 at 32-33.

### ii.   Actually and Necessarily Determined

If the prior judgment is a jury verdict and the jury "could
reasonably have grounded its verdict on an issue other than the
one in question," the ground has not necessarily been decided
and lacks preclusive effect.  *United States v. Fiel*, 35 F.3d
997, 1006 (4th Cir. 1997); *see also United States v. Ruhbayan*,
325 F.3d 197, 203 (4th Cir. 2003).  There is no ambiguity here.

The jury convicted Chapman of violating 15 U.S.C. § 80b-6,
§ 206 of the Investment Advisers Act.[17]  Although the Advisers

---

[17] The Act states:

> It shall be unlawful for any investment adviser, by
> use of the mails or any means or instrumentality of
> interstate commerce, directly or indirectly—
>
> (1) to employ any device, scheme, or artifice to
> defraud any client or prospective client;

Act contains four subsections,[17] the verdict form makes clear

that the jury found Chapman guilty under subsections (2) and (3)

---

> (2) to engage in any transaction, practice, or course
> of business which operates as a fraud or deceit upon
> any client or prospective client;
>
> (3) acting as principal for his own account, knowingly
> to sell any security to or purchase any security from
> a client, or acting as broker for a person other than
> such client, knowingly to effect any sale or purchase
> of any security for the account of such client,
> without disclosing to such client in writing before
> the completion of such transaction the capacity in
> which he is acting and obtaining the consent of the
> client to such transaction. The prohibitions of this
> paragraph shall not apply to any transaction with a
> customer of a broker or dealer if such broker or
> dealer is not acting as an investment adviser in
> relation to such transaction; or
>
> (4) to engage in any act, practice, or course of
> business which is fraudulent, deceptive, or
> manipulative. The Commission shall, for the purposes
> of this paragraph (4) by rules and regulations define,
> and prescribe means reasonably designed to prevent,
> such acts, practices, and courses of business as are
> fraudulent, deceptive, or manipulative.

15 U.S.C. § 80b-6.

[17] Only three define independent crimes.  Subsection (4) states
that:

> It shall be unlawful . . . to engage in any act . . .
> which is fraudulent, deceptive, or manipulative. The
> Commission shall, . . . by rules and regulations
> define . . . such acts, practices, and courses of
> business as are fraudulent, deceptive, or
> manipulative.

15 U.S.C. § 80b-6(4).  Thus, like § 10(b) of the Exchange Act,
subsection (4) defers to SEC rules to define violations.  *See,
e.g., SEC v. C.R. Richmond & Co.*, 565 F.2d 1101, 1105 (9th Cir.
1977) (finding a violation of § 206(4) through a violation of

15

of § 80b-6 on all three Investment Adviser Fraud counts.[18]   Jury

Verdict at 16-19.

---

SEC Rule 206(4)-1, 17 C.F.R. § 275.206(4)-1).  Chapman's
criminal violation did not involve those administrative rules.
*See* Indictment, ECF No. 149, Attach. 6 at 32-33.

     Accordingly, the jury could not have convicted Chapman
under subsection (4) of the Advisers Act; it necessarily
determined that Chapman violated at least one of the first three
subsections.

[18] Neither the indictment nor the jury instructions reference §
206(4) or its contents.  The indictment alleges that Chapman

     cause[d CCM], by use of the mails and of other means
     and instrumentalities of interstate commerce, directly
     and indirectly, to: (a) employ devices, schemes, and
     artifices to defraud the investment advisory clients .
     . .; (b) engage in transactions, practices, and
     courses of business which operated as a fraud and
     deceit upon these clients; *and* (c) act as a principal
     for its own account and knowingly purchase and sell
     securities for a client without disclosing to the
     client in writing before the completion of the
     transaction the capacity in which it was acting and
     obtaining the client's consent to the transaction.

ECF No. 149, Attach. 6 at 32-33 (emphasis added).  The jury
instructions state that the jury had to find (1) that CCM was an
investment adviser, (2) that Chapman, "acting on behalf of
[CCM], employed a device, scheme, or artifice to defraud . . .
the client," (3) that Chapman "devised or participated . . .
knowingly and willfully, and with the intent to defraud," and
(4) he employed the device, scheme, or artifice by use of the
mails or interstate commerce.  Court's Jury Instructions.  The
Court may consider the jury instructions to determine what the
jury necessarily decided.  *See, e.g., United States v. Beaty*,
245 F.3d 617, 625 (6th Cir. 2001) (relying on the fact that in
the previous trial "the judge specifically instructed the jury
to find Beaty not guilty if he established" an entrapment
defense to determine that the jury's determination that he was
not entrapped was necessary and essential to a guilty verdict).

Accordingly, the jury necessarily decided that CCM was an investment adviser and Chapman, CCM's employee, "engaged in transactions, practices, and courses of business which operated as a fraud and deceit upon" the DEM-MET trust clients, and:

> caused [TCC] to act as a principal for its own account and knowingly purchase and sell eChapman securities for a client without disclosing to the client in writing before the completion of the transaction the capacity in which it was acting, and obtaining the client's consent to the transaction

*Id.*

### iii. Finality, Validity, and Opportunity to Litigate

For the reasons discussed above, Chapman's conviction is final and valid, and he had a full and fair opportunity to litigate the charges during the criminal trial. Accordingly, Chapman is collaterally estopped from denying liability on count three of the complaint.

C.   Connection with the Sale of a Security

To obtain summary judgment on the securities fraud claim, the SEC must prove that Chapman's fraud was in connection with the sale of securities. *See SEC v. Zandford*, 535 U.S. 813, 819 (2002). Fraud is "in connection with" the sale of a security when the sale is "made to further [the] fraudulent scheme." *Id.* at 820 (analyzing Exchange Act §10(b) and SEC rule 10b-5). If the sale of securities is "properly viewed as a 'course of

business' that operated as a fraud or deceit on a stockbroker's customer," the requisite nexus is present.[19]  *Id.* at 821.

The jury found Chapman guilty of 13 counts of wire fraud and two counts of mail fraud.  Jury Verdict at 1-12.  All of them were based on communications "concerning" the "purchase" or transfer of shares of eChapman stock.  *See, e.g., id.* at 1, 4-8, 12-13.  Thus, Chapman's fraud, like Zandford's, was so closely linked to the sales of securities that there is no dispute that it was "in connection with" the sales of securities.  *See Zandford*, 535 U.S. at 820-22.  Accordingly, Chapman may not relitigate his liability for securities fraud under § 17(a) of the Securities Act, § 10(b) of the Exchange Act, or SEC Rule 10b-5.

---

[19] Zandford was a securities broker who persuaded William Wood to open an investment account for himself with Zandford and managed the account.  He promised Wood he would "conservatively invest" Wood's money; in fact, he transferred money from Wood's account to accounts that he controlled by writing checks to himself from Wood's mutual fund account (which required that Zandford liquidate securities in the account to redeem the checks). *Zandford*, 535 U.S. at 815-16.  Zandford was convicted of wire fraud, and the SEC filed a civil complaint, then moved for partial summary judgment based on the conviction.  *Id.*  The Supreme Court held that, assuming the truth of the allegations and that Zandford's conviction precluded him from relitigating the facts underlying the conviction, the SEC was entitled to partial summary judgment even though the conviction did not establish that the sales were "in connection with" the sales of securities.  *Id.* at 820-21.

D.    Relief

The SEC seeks: (1) a permanent injunction barring Chapman from further violations, (2) an officer/director bar against Chapman, (3) disgorgement of Chapman's salary and bonuses, plus pre-judgment interest, and (4) civil penalties.[20]  ECF No. 1 at 26-27, ECF No. 149 Attach. 1 at 33-38.  The Court may order these forms of relief, on a proper showing, upon granting summary judgment.  *See SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978); *SEC v. Lawbaugh*, 359 F. Supp. 2d 418, 424-26 (D. Md. 2005).

1.    Permanent Injunction

The SEC may seek a permanent injunction "[w]henever it shall appear to the [SEC] that any person is engaged or about to engage in any acts or practices which constitute a violation of" the Securities or Exchange Acts.  15 U.S.C. §§ 77t(b), 78u(d) (1), § 80b-9(d).  "[U]pon a proper showing a permanent . . . injunction . . . shall be granted."  *Id.*  The SEC need not prove irreparable injury or inadequacy of other remedies.  *SEC v. Marker*, 427 F. Supp. 2d 583, 590 (M.D.N.C. 2006) (*citing SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975)).  Instead, the Court must issue an injunction if the SEC

---

[20] Under Local Rule 101(2)(b), the Court may take any action it finds appropriate, and CCM is subject to default judgment on claims against it.  Accordingly, the SEC is entitled to the relief it requested in the complaint.  *Cf.* Fed. R. Civ. P. 55(b)(2).

"'demonstrates a reasonable and substantial likelihood that the
defendant, if not enjoined, will violate securities laws in the
future.'"   *Id.* (*quoting SEC v. Pros Int'l, Inc.*, 994 F.2d 767,
769 (10th Cir. 1993).

The Court considers five factors in deciding whether to
enjoin a defendant from violating securities laws:

> [1] the degree of scienter involved on the part of the
> defendant, [2] the isolated or recurrent nature of the
> infraction, [3] the defendant's recognition of the
> wrongful nature of his conduct, [4] the sincerity of
> his assurances against future violations, and [5] the
> likelihood, because of defendant's professional
> occupation, that future violations might occur.

*Lawbaugh*, 359 F. Supp. 2d at 424-25.

Here, Chapman had the specific intent to defraud when he
committed securities fraud. *See* part II.B.1.ii, *supra*.  He has
not recognized the wrongful nature of his acts nor promised he
would not commit future violations. *See* ECF No. 162 at 9
(Chapman's reply, in which he denies that the SEC can bring a
civil suit against him and argues that he should not be barred
from serving as an officer or director of public companies).
Chapman apparently intends to continue to serve as a director or
officer of public companies, and thus will have future opportun-
ities to repeat these violations.[21]  *Id.* at 8-9.  Though

---

[21] In his argument against disgorgement and imposition of civil
penalties, Chapman states that because of his conviction and age
he will be unable "to practice [his] previous profession of 30
years."  ECF No. 162 at 6.  It is unclear to which profession he

Chapman's violations occurred over a relatively short period of time,[22] the scheme involved multiple transactions, and all other factors favor the injunction.  The Court will permanently enjoin Chapman from future violations of § 17(a) of the Securities Act, § 10(b) of the Exchange Act, SEC Rule 10b-5, and § 206 of the Investment Adviser's Act.

> 2.   Officer/Director Bar

Under the Exchange Act, the Court may prohibit a defendant "from acting as an officer or director of [a public company] if the person's conduct demonstrates unfitness to serve as an officer or director of any such issuer."  15 U.S.C. § 78u(d)(2). The court considers:

> (1) the egregiousness of the underlying securities law violation; (2) the defendant's repeat offender status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur.

*Lawbaugh*, 339 F. Supp. 2d at 426 (internal quotation marks and citations omitted).

---

is referring: he notes that he has been a chairman, president, securities broker, investment adviser, and insurance agent.  *Id.*

[22] Other cases granting injunctions involved fraudulent schemes that stretched over several years.  *See Lawbaugh*, 359 F. Supp. 2d at 425 ("several years"); *Marker*, 427 F. Supp. 2d at 591 (two years); *SEC v. Zale*, 650 F.2d 718, 719 (5th Cir. 1981) (refusing to issue an injunction was improper when scheme occurred over six-year period).

Chapman played a central role in the fraud by orchestrating the purchasing scheme, and he had the specific intent to commit fraud.  As eChapman's majority shareholder, he had a large economic stake in the value of its stock.  As noted above, Chapman will likely have future opportunities to repeat his offenses.  *See* part II.E.2, *supra*.  Although this is Chapman's first offense, his abuse of his clients' trust and use of his investment management company to promote eChapman's well-being over that of his clients renders the offense egregious enough to merit imposing a permanent officer and director bar.  *See Lawbaugh*, 359 F. Supp. 2d at 426 (The court imposed a permanent bar when defendant caused bank where he worked to make payments to "companies he secretly controlled," altered documents to hide the fraud, and lied to investors about how he would invest their funds.).

### 3.   Disgorgement

The Court may order disgorgement, an equitable remedy, after finding a violation of securities laws.  *Lawbaugh*, 359 F. Supp. 2d at 425 (*citing SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 95-96 (2d Cir. 1978)).  Disgorgement forces the defendant to give up "unjust enrichment he received as a result of his illegal activities."  *Id*.  The SEC must show that the money to be disgorged was "causally related to [the] securities

violations."[24]   *SEC v. Resnick*, 604 F. Supp. 2d 773, 783 (D. Md. 2009).[25]

The SEC seeks disgorgement of Chapman's salary and bonuses from June through December, 2000, because "[h]is actions ultimately and directly resulted in the failure of . . . TCC and CCM." ECF No. 149 Attach. 1 at 37. The SEC does not contend that Chapman would not have received his salary or bonuses for those months if the eChapman IPO failed. *Compare* ECF No. 149 Attach. 1 at 37 *with Resnick*, 604 F. Supp. 2d at 783 (The defendant's "bonuses were tied to [the victim] meeting its earnings targets, and [the defendant] was convicted of manipulating [the victim's] earnings figures so that it would meet those targets."). The SEC has not shown a causal relationship between Chapman's salary and bonuses and the fraud. Disgorgement will not be ordered.

---

[24] The Court may order disgorgement even if the defendant has already reimbursed the parties or otherwise returned the unjust enrichment; the Court simply credits the compensation and takes notice that disgorgement has already been satisfied. *Lawbaugh*, 359 F. Supp. 2d at 425.

[25] Granting disgorgement of defendant's bonuses because they depended on company profits, which he fraudulently caused to appear inflated, but denying disgorgement of his salary because it was not reasonable to infer that his "entire income . . . was tied to" the fraud. *Resnick*, 604 F. Supp. 2d at 783; *see also Marker*, 427 F. Supp. 2d at 591 (ordering disgorgement of funds the defendants "fraudulently obtained from investors").

4.    Civil Penalties

The SEC seeks imposition of a civil penalty against Chapman for his fraud.  The Securities, Exchange, and Investment Advisers Acts authorize civil monetary penalties to redress violations of those Acts.  15 U.S.C. §§ 77t(d), 78u(d)(3), 80b-9(e).  The SEC seeks third-tier--maximum--penalties because of the deliberate nature of and substantial loss caused by Chapman's scheme.  ECF No. 149 Attach. 1 at 37-38.

The Court must determine the amount of the penalty "in light of the facts and circumstances."  15 U.S.C. §§ 77t(d)(2)(A), 78u(d)(3)(B)(i), 80b-9(e)(2)(A).  The Court may impose a penalty of the greater of: (1) $110,000 for a natural person or $550,000 for a company for each violation or (2) the gross amount of pecuniary gain to the defendant as a result of the violation, if the violation "involved fraud, deceit, [or] manipulation" and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."  15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii), 80b-9(e)(2)(C).[25]

Chapman's violations involved fraud--he was convicted of multiple counts of mail and wire fraud and investment adviser

---

[25] The civil penalties are adjusted for inflation.  The adjustments for violations occurring between December 10, 1996 and February 2, 2001 are in Table 1 to Subpart E of 17 C.F.R. § 201.  17 C.F.R. §§ 201.1001; 201, Subpt. E, Tbl. I.

fraud that form the basis of the civil suit--and they resulted in over $5 million in losses to the DEM-MET trust clients. Jury Verdict at 1-13, 16-19, 27. Considering the large losses and Chapman's intentional, central role in the violation, a third-tier penalty is appropriate.

The SEC has not identified Chapman's gross pecuniary gain from the fraud. *See* Part II.E.3, *supra*. Accordingly, the Court will impose a civil monetary penalty of $110,000 against Chapman.[27]

E.  Chapman's Settlement Argument

Chapman contends that he is "being punished because [he] would not agree to sign a settlement agreement" with the SEC. ECF No. 162 at 8. The SEC is authorized to seek the relief it requests. *See* 15 U.S.C. §§ 77t(b), (d), (e), 78u(d)(1)-(3), 80b-9(d)-(e). The argument lacks merit.

---

[27] Chapman was also ordered to pay full restitution in the criminal trial. *See* ECF No. 149 Attach. 6 at 5. The civil penalty does not raise double-jeopardy concerns or impose an unfair double-burden on Chapman. The civil penalties punish Chapman, and restitution restores the victims. *See Resnik*, 604 F. Supp. 2d at 784.

The SEC did not request a sum certain against CCM in the complaint. Accordingly, the Court will not enter civil penalties against CCM without a hearing or other proceeding that preserves CCM's right to a jury trial. Fed. R. Civ. P. 55(b)(2).

III. Conclusion

For the reasons stated above, the SEC's motion for partial summary judgment will be granted.


_____
11/29/11
Date


_____
William D. Quarles, Jr.
United States District Judge